**James Douglas JOHNSON, Jr.,
Appellant,**

v.

**STATE of Texas, State.**

**No. 2–83–276–CR.**

Court of Appeals of Texas,
Fort Worth.

Nov. 9, 1983.

David K. Chapman, San Antonio, for appellant.

Sam D. Millsap, Jr., Dist. Atty., and Alan Battaglia, Asst. Dist. Atty., San Antonio, for appellee.

Before FENDER, C.J., and HUGHES and ASHWORTH, JJ.

## OPINION

HUGHES, Justice.

James Douglas Johnson, Jr., has appealed his conviction of the offense of attempted murder. After the jury found him guilty, the judge assessed his punishment at con-

finement in the Texas Department of Corrections for twenty years.

We affirm.

Appellant has ten numbered grounds of error, but they really amount to two questions for us:

One—Did the trial court err in orally communicating with the jury without the knowledge or consent of appellant or his lawyer?

Two—Did the trial court err in admitting Exhibit numbers 65, 66, 67, 68, 55, 56, 57, and 23A and the testimony of Dr. Vincent Di Maio into evidence? (Grounds of error 2 through 10).

Appellant's brief adequately sets forth the facts on which the first ground of error is based:

While the jurors were deliberating during the late afternoon hours, the trial court asked the court reporter to obtain a "separation agreement" from counsel for the parties. Appellant's counsel refused to sign this agreement. Some time later, the court asked the bailiff to "inquire of the jury whether they thought they were going to arrive at a verdict tonight so that arrangements could be made."

The bailiff testified that at approximately 5:15 p.m., he first communicated with the jury. The trial judge had asked him to ask the jurors "if they needed to make arrangements and to write the phone numbers down where we could call and tell whoever, what they needed to bring to the overnight quarters." The jury had been deliberating since 2:06 p.m. The bailiff's communication was not made in writing nor was it in response to any written inquiry from the jury.

At least some members of the jury were "upset" about the prospect of being sequestered for the night; they communicated this concern to the bailiff. The bailiff told the trial judge that some of the jurors could not spend the night away from their homes.

According to the trial judge, the bailiff's 5:15 communication was the second time the bailiff had spoken to the jurors about overnight accommodations at the court's re-

quest. The first communication had occurred at approximately 4:45 p.m., at which time the jurors had indicated that they wished to continue deliberating until 5:15 p.m.

After the 5:15 communication, the bailiff began searching for hotel accommodations for the jurors. His limited efforts in this endeavor met with little success.

During all of these communications with the jury, counsel for appellant was out of the courtroom.

At approximately 6:00 p.m., the trial court summoned defense counsel to the courtroom to confer about sequestering the jury. At 6:05 p.m., the jury returned its verdict. Immediately thereafter, counsel for appellant requested the hearing that developed the foregoing facts and made clear that he objected to the trial court's communicating with the jurors "without the attorneys being present."

We do not see that communicating with the jury concerning such matters as retrieving cars from a parking lot or making arrangements for them to spend the night during deliberations would amount to "additional instructions" on the law. *Nacol v. State,* 590 S.W.2d 481 (Tex.Cr.App.1979). Although it would have been more proper for the trial judge to have had the lawyers present, we hold it not to be reversible. Arranging for automobile parking and overnight accommodations is nothing more than what bailiffs do in communicating to jurors about going to lunch or other matters involving the comfort of the jury. We overrule the first ground of error.

Appellant asserts in his last nine grounds of error that testimony and exhibits showing that Mrs. Horton's deceased husband was the victim of a deadly assault, also convinced the jury that appellant committed an offense extraneous to the one charged while not even showing appellant was connected with such offense.

It was shown in the evidence that appellant came into the home of Glen Horton and his wife, Barbara, between 1:30 p.m. and 2:00 p.m. on March 11, 1981.

Dawn and Denise Horton discovered their injured mother and the body of their father when they returned home from school sometime after 4:00 p.m.

Dr. Di Maio, the Bexar County Medical Examiner, testified that he performed the autopsy on the body of Glen Horton. He found head wounds which he said were consistent with having been struck with a hammer. He also found seven gunshot wounds and recovered three .22 caliber bullets and three .38 caliber bullets from the body. He testified that Glen Horton died as a result of multiple gunshot wounds and death was listed as a homicide.

Test results on the bullets taken from Glen Horton's body revealed that two different guns were used.

The evidence in the record clearly established that the murder of Glen Horton was part of the same transaction in which the attempted murder of the complainant, Barbara Horton, took place. The evidence also clearly established appellant's participation in the entire incident as it tragically unfolded at the Horton's home on March 11, 1981.

Appellant used the name of Larry West. While appellant was in the house, Glen Horton heard a knock and went to the front door and opened it. A small man with a .22 automatic entered and ordered the complainant, Barbara Horton to "Get down". This small man tied Barbara Horton's hands and appellant moved the complainant's feet together so that they could be tied.

Leaving appellant with Glen Horton, the small man dragged Barbara Horton to the utility room in the garage area and struck her in the head with a hammer. The next thing Barbara Horton remembered was waking in the hospital.

An inventory revealed that a number of items were taken from the Horton's home including Glen Horton's black briefcase and the Horton's station wagon was found about four or five blocks from their residence.

Olga Rivera testified that on the date in question, around 2:45 or 3:00 p.m., she saw the station wagon being parked. There

were two men, one a tall black man, who took a black briefcase out of the station wagon, put it into another car and rode away in the second car.

Barbara Horton testified that appellant is about 6'8" tall.

■ Clearly, the murder of Mr. Horton is part and parcel of the same transaction as the attempted murder of his wife and such murder was admissible to show the context in which the instant offense occurred. *Hoffert v. State,* 623 S.W.2d 141 (Tex.Cr.App. 1981). We hold that the objected to exhibits are admissible and the testimony of Dr. Di Maio as well. We overrule grounds of error two through ten.

We affirm.